**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**


PANDA ALLIA,                    :    Civ. A. No.  07-4130(NLH)(AMD)

      Plaintiff,              :

         v.                  :    **OPINION**

TARGET CORPORATION,             :

      Defendant.              :


**Appearances:**

Richard L. Press, Esquire
Daniel M. Kurkowski, Esquire
Law Offices of Richard L. Press & Associates, LLC
23 E. Black Horse Pike
Pleasantville, NJ 08232
    *On behalf of plaintiff*

David M. Walsh, Esquire
LeRoy John Watkins, Esquire
Jackson Lewis LLP
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, NJ 07960

Michael A. Warner, Jr., Esquire (pro hac vice)
Staci Ketay Rotman, Esquire (pro hac vice)
Franczek Radelet, P.C.
300 South Wacker Drive
Suite 3400
Chicago, IL 60606

    *On behalf of defendant*


**HILLMAN**, District Judge

    This matter has come before the Court on defendant's motions

for summary judgment on plaintiff's employment discrimination

claims and on its counterclaim for breach of their

confidentiality agreement.  For the reasons expressed below, both of defendant's motions will be granted.

## BACKGROUND

Plaintiff, Panda Allia, a Caucasian female, was a human resources executive at defendant, Target Corporation, from May 2003 until January 25, 2007.  According to plaintiff, she was an exemplary employee who received nothing but positive reviews from superiors, co-workers, and subordinates.  Nevertheless, she alleges, she was transferred and ultimately fired for several reasons: a) in order to appease Target's African-American employees at its Springfield, Pennsylvania store, who had filed a race discrimination complaint with the EEOC; b) because during the EEOC investigation she pointed out to Target's attorneys inconsistencies in a more-senior employee's testimony; c) because of her mental disability, which Target created; d) and because she filed criminal charges against an African-American co-worker for assault.  Overall, plaintiff alleges that she, as a white employee, was the scapegoat for Target's race-relations problems, and Target has portrayed plaintiff as a poorly-performing racist in order to justify its discriminatory conduct in firing her. Plaintiff claims the defendant's conduct violated the New Jersey Law Against Discrimination ("NJLAD"), the Family Medical Leave Act ("FMLA"), and the Conscientious Employee Protection Act ("CEPA").

Target has moved for summary judgment on plaintiff's claims against it.  Target argues that plaintiff has failed to provide evidence to support a *prima facie* case for her claims under the NJLAD, FMLA, and CEPA.  Target also argues that even if she could establish a *prima facie* case for each claim, she cannot rebut Target's legitimate reasons for terminating her--namely, that she was an ineffective HR executive who was insensitive to minorities' concerns and who otherwise failed to take any accountability for her subpar job performance.

Target has also moved for summary judgment in its favor on its counterclaim against plaintiff for breach of contract. Target alleges that plaintiff breached the confidentiality agreement she signed when Target hired her by disclosing confidential and privileged information during this litigation. Target is also seeking an injunction to prevent plaintiff from further disclosing such information.  Plaintiff has opposed both of Target's motions.

## DISCUSSION

### I.   Jurisdiction

This Court has jurisdiction over plaintiff's federal claim under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

II.  **Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine

4

issue for trial.  Id.  Thus, to withstand a properly supported
motion for summary judgment, the nonmoving party must identify
specific facts and affirmative evidence that contradict those
offered by the moving party.  Anderson, 477 U.S. at 256-57.  A
party opposing summary judgment must do more than just rest upon
mere allegations, general denials, or vague statements.  Saldana
v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**III. Analysis**

    **A.**   ***Target's motion for summary judgment on plaintiff's***
            ***claims against it***

    Plaintiff has advanced four counts against Target: Count One
- discrimination and retaliation against plaintiff in violation
of NJLAD; Count Two - retaliation for exercising her FMLA rights;
Count Three - retaliation under CEPA; and Count Four - fostering
a hostile work environment in violation of NJLAD.  Each category
of claims will be addressed in turn.

        **1.**   **Plaintiff's race discrimination claim**

    Plaintiff claims that she was discriminated against by
Target because she is white.[1]  Typically, a *prima facie* case of
unlawful discrimination in the workplace under the NJLAD is
established when a plaintiff demonstrates by a preponderance of
the evidence that he or she (1) belongs to a protected class, (2)
applied and was qualified for a position for which the employer

---

     [1]Plaintiff does not claim that she was discriminated against
because she is a woman.

was seeking applicants, (3) suffered an adverse employment action and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications.  Erickson v. Marsh & McLennan, Co., 569 A.2d 793, 550 (N.J. 1990) (citations omitted).

When the plaintiff is not a member of a protected class, however, the plaintiff "must substantiate . . . that the background circumstances support the suspicion that the defendant is the unusual employer who discriminates against the majority." Erickson, 569 A.2d at 551 (internal quotations and citations omitted).  This is because "when a complainant is a member of the majority and not representative of persons usually discriminated against in the work place, discrimination directed against that person is 'unusual.'"  Id.  Therefore, a court must apply a modified version of the familiar McDonnell Douglas burden-shifting analysis to claims of reverse discrimination in employment.  Mosca v. Cole, 217 Fed. Appx. 158 (3d Cir. 2007) (citing Iadimarco v. Runyon, 190 F.3d 151, 158 (3d Cir. 1999); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

First, in order to establish a *prima facie* case of reverse discrimination, a non-minority plaintiff must show: (1) she was qualified for the job which she held; (2) despite her qualifications, she was terminated by her employer; and (3) plaintiff has presented sufficient evidence to allow a reasonable fact finder to conclude, given the totality of circumstances,

that the employer treated plaintiff less favorably because of her race.  Mosca v. Cole, 384 F. Supp. 2d 757, 765 (D.N.J. 2005), aff'd 217 Fed. Appx. 158 (3d Cir. Feb 14, 2007); see also Iadimarco, 190 F.3d at 161 (stating that a non-minority plaintiff first establish a *prima facie* case of discrimination by presenting "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based on a trait that is protected").

Should a plaintiff establish a *prime facie* case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions.  "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). This is a light burden.  Id.

Once the employer has made its nondiscriminatory reason for termination, the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision.  Zive v. Stanley Roberts, Inc., 867 A.2d 1133, 1139 (N.J. 2005).  To prove pretext, a plaintiff may not simply show that the employer's reason was false but must also demonstrate

7

that the employer was motivated by discriminatory intent.  Id.
That burden merges with the plaintiff's ultimate burden of
persuading the court that she or he was subjected to intentional
discrimination, but the burden of proof of discrimination does
not shift; it remains with the employee at all times.  Id.

In this case, prior to determining whether plaintiff has
established a *prima facie* case of reverse discrimination, the
basis for her *prima facie* case must first be discerned.  Although
it is clear that plaintiff claims she was discriminated against
because she is white, it is less clear what adverse employment
action she is contending was a result of this alleged
discrimination.  Additionally, plaintiff seems to conflate her
discrimination, retaliation, and hostile work environment claims,
as well as her claim for disability discrimination.  It appears
that plaintiff claims that she suffered two adverse employment
actions because of her race: (1) being transferred from the
Springfield store to the Gloucester store,[2] and (2) being
terminated from the Gloucester store.

With regard to the transfer, such a change in employment
status could qualify as an adverse employment action.  See

---

[2]There is evidence in the record regarding the possibility
of plaintiff being transferred to the Mays Landing, New Jersey
store prior to her request to be transferred to the Gloucester
store.  Plaintiff testified in her deposition that she did not
wish to be transferred to that location because it was an hour
and a half drive from her home, and her request was honored.  It
does not appear that plaintiff bases a race discrimination claim
on any proposed transfer to the Mays Landing store.

<u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 71 (2006) (finding that the "reassignment of job duties is not automatically actionable," but transfer from a position that was "objectively considered a better job" to a position that was "by all accounts more arduous and dirtier" can be an adverse employment action); <u>Durham Life Ins. Co. v. Evans</u>, 166 F.3d 139, 152-53 (3d Cir. 1999) (citation and quotations omitted) ("The Supreme Court has defined a tangible employment action as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.").  In this case, plaintiff was transferred from the Springfield, Pennsylvania store in July 2006 to the Gloucester County store in Sicklerville, New Jersey.  Plaintiff, however, does not explain how this was an adverse employment action. Plaintiff testified in her deposition that she asked for the transfer to the Gloucester store, which was only minutes from her home, rather than the forty-five-plus minute commute to the Springfield store.  Plaintiff also does not refute Target's evidence that the Gloucester store was brand new, and that a position at a new location is considered a promotion.  Plaintiff also does not indicate that she suffered any loss in wages, status, or any other negative consequence of the transfer.[3]

---

[3]<u>See, e.g.</u>, <u>DiCampli v. Korman Communities</u>, 257 Fed. Appx. 497, 501 (3d Cir. 2007) (finding that the plaintiff's claims that

Other than pointing out that an African-American replaced her at the Springfield store, plaintiff has not articulated any reason to find that her transfer to the Gloucester store was the result of discrimination.  Thus, her transfer cannot be a basis for a NJLAD claim.

With regard to her termination from the Gloucester store, it is unquestionable that termination from employment is an adverse employment action.  Plaintiff was terminated on January 27, 2007 in the days following the settlement of the EEOC litigation that arose out of the Springfield store while plaintiff was HR manager at that location.  Plaintiff contends that she was eminently qualified for her position, but defendant fired her because while she worked at the Springfield store she did not correctly identify the rapper "Biggie Smalls" on a poster.  She further claims that her termination was a culmination of Target's plan to replace white employees with black employees.  In contrast, Target argues that plaintiff was not performing her job duties appropriately, and she was terminated for her poor performance, and not as part of some master plan to replace white employees

---

an involuntary job transfer to a "desk job" that offered less prestige and fewer opportunities for performance bonuses was an adverse employment action was without merit because it had identical pay and benefits, she had no proof that her bonus opportunities would have been reduced, and "the mere fact that the IT position would have required a change in location and a longer commute is not sufficient to constitute an adverse action").

with black employees.  Indeed, Target points out that plaintiff was replaced by a white female at the Gloucester store.

The Court finds that plaintiff has failed to establish a *prima facie* case of "reverse" race discrimination.  As to her qualifications for the job, plaintiff's superiors summarize her "detrimental conduct" at both the Springfield and Gloucester store locations as follows:

> [A]t the Springfield store she was not an effective conduit for concerns from minority employees. (Exhibit F at ¶35). She was supposed to be the early warning for such concerns and she was not. (Exhibit F at ¶35). She contributed to the racial issues in the store by demonstrating a lack of sensitivity as evidenced by her misidentification of the poster of rapper "Biggie Smalls" as Martin Luther King. (Exhibit F at ¶35). She also failed to ensure that executive team members at the Springfield store administered disciplinary policies consistently, as was evidenced by the fact that some employees were terminated after one "no call-no show" while others were not terminated until they had accumulated several absences. (Exhibit F at ¶35).  Finally, as confirmed by the reports of Perryman and observations of Ginaldi and Hauptman, since her transfer to the Springfield store, Allia had continued to cause disruption and damage to employee relationships at that store. (Exhibit F at ¶36). This pattern confirmed to Acuna and Ginaldi that the controversy and interpersonal conflicts that seemed to always surround Allia was primarily a product of her own detrimental conduct, as opposed to the conduct of others as she had repeatedly claimed in the past. (Exhibit F at ¶36).[4]

---

[4]Ariel Acuna was Group Human Resources Director; Robyn Hauptman was Group Human Resources Representative; Jules Ginaldi was District Team Leader responsible for the Gloucester store; Genevieve Perryman was the Gloucester store team leader.  Either directly or through a "dotted line" reporting relationship, Plaintiff reported to all of these individuals.

(Def. Statement of Facts ¶¶ 105-107.)[5]

Other than admitting to not being able to identify the rapper Biggie Smalls on a poster, plaintiff refutes that she was not adequately performing her job duties.  She contends that she was well-liked and respected at both stores, which is evidenced by the numerous "Great Team Cards" she received from non-management level fellow employees.[6]  Further, she contends that she only received positive reviews during all of her formal performance evaluations.

Plaintiff's "proof" is insufficient to establish the "qualified for the job which she held" element of her *prima facie* case.  First, "Great Team Cards" filled out by subordinates do not demonstrate that plaintiff was performing to the expectations of her supervisors, who are responsible for the decision of whether to terminate plaintiff.  Further, Target has provided numerous examples from other employees, both minority and non-minority, who did not send plaintiff "Great Team Cards" and felt that plaintiff was insensitive to their concerns.  Second,

_____

[5]In her statement of facts, plaintiff quotes from a letter by Target's counsel sent to plaintiff's counsel in response to a demand letter by plaintiff's counsel.  (Pl. Statement of Fact ¶ 110 & Ex. 30.)  In that letter, copied into plaintiff's statement of facts, Target's counsel lists in greater detail plaintiff's performance deficiencies.  Because this letter was drafted as a part of settlement negotiations, it will not be considered.  See F.R.E. 408.

[6]A "Great Team Card" is an informal note of appreciation written by a co-worker.

despite plaintiff's claim that she only received positive reviews, Target has provided evidence that plaintiff had been counseled on various performance issues.[7]  Finally, plaintiff's subjective reflection on her performance, without more, is not sufficient to satisfy the objective qualifications of the job.

Plaintiff's proofs must also provide evidence that an employer acted in a way that inappropriately considered an employee's race.  The third element of a *prima facie* case of "reverse" race discrimination requires sufficient evidence to allow a reasonable fact finder to conclude, given the totality of circumstances, that the employer treated plaintiff less favorably because of her race.  Plaintiff has not provided any evidence that Target's decision to terminate her from the Gloucester store was in any way related to plaintiff being white.  Plaintiff has not demonstrated that she was replaced by a person of a minority race, that a minority employee of her same status was treated more favorably, or that race was ever an issue in the Gloucester store during her six months as the top HR executive there.

---

[7]Plaintiff claims that she only received positive performance evaluations from her former supervisor, Springfield store manager, Jeff Barnes.  He was the main focus of the EEOC complaints, and he was subsequently terminated following the settlement of the EEOC litigation.  Target states that because of Barnes' lack of judgment and abilities, his reviews were not considered.  Further, Target argues that his reviews are immaterial because they did not reflect plaintiff's performance at the Gloucester store, and he did not have any part of the decision to terminate plaintiff.  For purposes of this motion, the Court will accept plaintiff's contention that Barnes' reviews during her tenure at the Springfield store were mainly positive.

Even if the Court were to continue in the McDonnell Douglas burden-shifting analysis on plaintiff's race discrimination claim for her termination from the Gloucester store, she has not provided any evidence to show that Target's proffered reason of poor performance was not only false, but, moreover, that Target was actually motivated by discriminatory intent.  Plaintiff urges the Court to consider the "continuum of events stemming from" the EEOC complaint to plaintiff's transfer and subsequent termination--that the reason she was transferred to the Gloucester store was to put a minority in her position at the Springfield store, and the culmination of Target's discriminatory intent was her termination six months later once the EEOC suit settled.  There are two problems with this argument.  First, although plaintiff argues generally that Target's conduct constituted a continuing violation, the continuing violation doctrine is only implicated when a statute of limitations issue arises, and that issue is not implicated here.  Roa v. Roa, 985 A.2d 1225, 1231 (N.J. 2010) (citation omitted) ("For causes of action arising under anti-discrimination laws, . . . a judicially created doctrine known as the continuing violation theory has developed as an equitable exception to the statute of limitations.").

Second, plaintiff's continuum argument ignores that (1) her transfer to the Gloucester store was at her request, and she

14

considered it a positive move,[8] (2) her termination was supported by six additional months of employment with Target, during which time race was not an issue, and (3) she was replaced by a white woman.  In evaluating employment cases, the task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose.  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 525-27 (3d Cir. 1992).  Thus, even if the Court credited plaintiff's position that she performed her job appropriately, she has not provided any evidence that her race, rather than any other reason, was the true motivation.  See Velantzas v. Colgate-Palmolive Co., Inc., 536 A.2d 237 (N.J. 1988)) ("It is undisputed that plaintiff was an at-will employee who could be fired by defendants 'for no specific reason or simply [for] bothering the boss.'").  Consequently, Target is entitled to judgment in its favor on plaintiff's race discrimination claim.

## 2.   Plaintiff's disability discrimination claim

Plaintiff claims that she was discriminated against because of her psychological disability in violation of the NJLAD.  See

---

[8]Target explains that although plaintiff had performance issues while at the Springfield store, Target transferred plaintiff to provide her the benefit of the doubt because of the poor race-relations allegedly fostered by her superior, store manager Jeff Barnes.  Although plaintiff acknowledges this "fresh start," (Pl. Opp. at 23), whether this was a true motivation is immaterial, however, because as discussed above, the transfer cannot be considered an adverse employment action.

N.J.S.A. 10:5-4.1 to -29.1.  New Jersey courts have articulated the elements of a *prima facie* case of disability discrimination, identifying the following common factors: (1) plaintiff was handicapped or disabled within the meaning of the statute; (2) plaintiff was qualified to perform the essential functions of the position of employment, with or without accommodation; (3) plaintiff suffered an adverse employment action because of the handicap or disability; and (4) the employer sought another to perform the same work after plaintiff had been removed from the position.  Victor v. State, 952 A.2d 493, 501 (N.J. Super. Ct. App. Div. 2008) (citations omitted).  If a plaintiff establishes a *prima facie* case, the McDonnell Douglas burden-shifting analysis, described above, is implicated.

In this case, plaintiff claims that she was disabled due to her psychological conditions of depression, anxiety, and bipolar disorder, and that Target fired her because of these conditions. More specifically, plaintiff contends that Target's conduct and lack of support during the EEOC investigation caused her psychological conditions, Target knew that it created these conditions, Target knew that she was suffering from such conditions, and Target treated her poorly and ultimately fired her as a result.

Even accepting as true the other three elements of her *prima facie* case, plaintiff cannot show that she was fired from the Gloucester store because of her disability.  Plaintiff attempts

16

to provide several bases to support this element.  One basis is that in January 2005, while plaintiff was still the HR executive at the Springfield store, plaintiff overheard a store team leader from the Turnersville, New Jersey store refer to plaintiff as a "psycho bitch" during a telephone call with the Springfield store manager.  Plaintiff claims that although she reported this comment through the proper channels, Target did not investigate the matter or otherwise support her.

Another basis is Target's knowledge that plaintiff was required to take leave to deal with the mental disabilities Target caused her by putting her in the cross-hairs of the EEOC litigation.  Plaintiff also argues that because all her superiors knew of her psychological conditions, she was not afforded the "clean start" promised by Target as a result of the transfer to the Gloucester store.  Because of the "psycho bitch" comment, Target's lack of response, and its lack of support in acknowledging its role in creating her disabilities, plaintiff claims that Target's ultimate termination of her was a direct result of her disability.

Plaintiff's arguments are not sufficient and are not supported by any evidence.  First, a stray comment by a non-decision-maker co-worker two years before her termination is not actionable.[9]  <u>Parker v. Verizon Pennsylvania, Inc.</u>, 309 Fed.

---

[9]It is even questionable whether plaintiff can prove that she would have been considered disabled in January 2005, or that

Appx. 551, 559 (3d Cir. 2009) (citing <u>Fuentes</u>, 32 F.3d at 767) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").  Second, plaintiff supports her other propositions with conclusory statements like, "It is impossible to accept that Defendant did not know of her disabling mental condition"; "The events that transpired after the EEOC article simply started a continuum of events that would lead to Plaintiff's disorders. Target was aware of these disorders."; and "[D]ue to the fact that Craig Synderman had been promoted to Group Director, it was impossible to believe that the employees at her new Store would not know about her psychological disabilities." (Pl. Opp. at 22-23.)  These statements are not evidence, and are not supported by evidence.  Additionally, plaintiff has not presented any evidence that the Target employees who decided to terminate her were aware of her disability.

Finally, plaintiff's disability discrimination claim fails because even if Target created her psychological condition, and even if Target knew of her psychological condition, plaintiff has not provided any evidence, or any explanation, as to how her psychological condition formed the basis for her termination.  It

---

the Turnersville store manager knew that plaintiff suffered from any diagnosed psychological condition.  (See Pl.'s Ex. 33, which includes initial doctor's notes dated March 8, 2006.)

is apparent that plaintiff believes that she was terminated not because of poor performance, but because of her race, and because of her disability.  Just like her race discrimination claim, however, plaintiff cannot show that discrimination toward her psychological disability was the motivating reason behind her termination.  The fact that plaintiff suffers from a disability does not prevent her employer from terminating her for other reasons.  Beck v. Tribert, 711 A.2d 951, 958 (N.J. Super. Ct. App. Div. 1998) (quoting Velantzas v. Colgate-Palmolive Co., Inc., 536 A.2d 237 (N.J. 1988)).  Accordingly, Target is entitled to judgment on plaintiff's disability discrimination claim.

### 3.   Plaintiff's retaliation claims

Plaintiff claims that she was retaliated against in three ways: (1) for filing a criminal complaint against her co-worker, in violation of the NJLAD; (2) for pointing out to Target's attorneys in the EEOC litigation discrepancies in a superior's notes, in violation of CEPA; and (3) for taking FMLA leave. Plaintiff cannot prove a *prima facie* case for any of these claims.

With regard to plaintiff's first retaliation claim, to establish a *prima facie* case for retaliation under the NJLAD, plaintiff must show: (1) she engaged in protected employee activity; (2) the employer took adverse action against her after, or contemporaneous with, her activity; and (3) a causal link exists between her activity and the employer's action against

her.  Muzslay v. City of Ocean City, 238 Fed. Appx. 785, 789 (3d
Cir. 2007) (citing Abramson v. William Paterson College, 260 F.3d
265, 286 (3d Cir. 2001)).  Plaintiff claims that she engaged in
protected activity when she reported to her superiors and to the
police an assault by a co-worker.  According to plaintiff, in
November 2006 she asked a team leader, JuJuan Robinson, who is
African-American, to complete some paperwork.  Ms. Robinson
allegedly replied, "if someone would just use the word please, I
would sign it, instead of shoving it in my face."  Plaintiff
claims that Ms. Robinson then thrust a two-inch thick stack of
papers into plaintiff's chest, causing redness and bruising.
Plaintiff reported this incident to store security and the store
manager, when reported it to Ariel Acuna, Group Human Resources
Director and Robyn Hauptman, Group Human Resources
Representative.  Plaintiff requested to see the security video
tape of the altercation, but no recording existed, even though
plaintiff insisted it did.  Because plaintiff believed that
Target did not properly investigate the incident, a few days
later she reported it to the police and pressed charges against
Ms. Robinson.  Plaintiff ultimately dropped the charges, because
she claims that she did not wish another race issue to present
itself.[10]

---

[10]Plaintiff does not contest that she did not inform Ms.
Robinson that she decided not to pursue the charges, causing Ms.
Robinson to unnecessarily appear in court.

Plaintiff cannot meet her *prima facie* case because she did not engage in "protected activity."  In order for an activity to be "protected" under the NJLAD, plaintiff must have made some sort of complaint that her rights under the NJLAD had been violated.  N.J.S.A. 10:5-12(d) (providing that it shall be unlawful for "any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act"); see also, e.g., Montanye v. Wissahickon School Dist., 218 Fed. Appx. 126, 131 (3d Cir. 2007) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)) (explaining that in addition to instituting lawsuits, filing affirmative action complaints, and participating in litigation, other examples of protected activity are "making complaints to management," "writing critical letters," "protesting against discrimination," and "expressing support of co-workers").  Although plaintiff made complaints to management and effectively instituted litigation, it was with regard to a charge of a physical assault, and not related to any protection afforded by New Jersey's anti-discrimination law.  There is no evidence that plaintiff believed Ms. Robinson's alleged assault

was motivated by racial bias, and plaintiff does not provide any evidence that she complained to Target management that Ms. Robinson assaulted her because of plaintiff's race. Simply because Ms. Robinson is black and plaintiff is white does not turn an altercation between co-workers into a racially motivated incident, and it does not turn the reporting of such an altercation into an activity protected by the NJLAD.

Next, with regard to plaintiff's CEPA claim, plaintiff has failed to allege any of the elements necessary to support such a claim. A plaintiff who brings a CEPA claim must demonstrate that: (1) she reasonably believed that her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3; (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003).

In support of her CEPA claim, plaintiff contends that she was ultimately terminated because during the pendency of the EEOC litigation, she pointed out to Target's attorneys who were defending Target in the EEOC case that the notes and timeline of events provided by Craig Snyderman, District Manager overseeing the Springfield store, were incorrect. This is insufficient to make a *prima facie* case for a CEPA violation.

First, plaintiff cannot articulate how Target violated any law.  Even if it is true that Mr. Snyderman provided inaccurate or false information to Target's attorneys, plaintiff has not provided any evidence that Target used that information in any manner that violates the law or was otherwise contrary to the purposes of CEPA.  Maw v. Advanced Clinical Communications, Inc., 846 A.2d 604, 608 (N.J. 2004) (confirming that he complained of activity must be "indisputably dangerous to the public health, safety or welfare," and that the dispute between employer and employee must be more than a private disagreement).  Second, it is questionable that notifying Target's attorneys, during an attorney-client privileged conversation, about a fellow employee's alleged fabrications during the investigation and defense of a lawsuit constitutes a "whistle-blowing" activity.  See N.J.S.A. 34:19-3.  Finally, even if the other two elements were met, plaintiff has not provided any evidence that her statements about Mr. Snyderman were connected to her termination a year and a half later.  Consequently, her CEPA claim fails.

Plaintiff also claims that she was retaliated against for taking FMLA leave.  In order to prove that claim, she must first establish a *prima facie* case of discriminatory retaliation and demonstrate that: (1) she took FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her leave.  Lepore v. Lanvision Sys., Inc., 113 Fed. Appx. 449, 452, 2004 WL 2360994, *2 (3d Cir. 2004)

(citing <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135 (3d Cir. 2004)).

It is unclear when plaintiff took specific FMLA leave for her psychological condition, but the record does demonstrate that from February 22, 2006 through March 8, 2006, she asked for, and was granted, two weeks of paid time off based on a doctor's note indicating she was under a doctor's care for depression and anxiety.  Additionally, after a December 21, 2006 meeting with Robyn Hauptman, Group Human Resources Representative, and Genevieve Perryman, Gloucester store team leader, to discuss plaintiff's performance issues, plaintiff accepted Ms. Hauptman and Ms. Perryman's offer to take some time off.  She submitted a doctor's note the next day, and was granted paid leave from December 22, 2006 through January 7, 2007.[11]  Plaintiff, however, never specifically availed herself of formal FMLA leave.[12]

Even if these two periods of leave constitute FMLA leave, plaintiff has not demonstrated that her taking of such leave led to her termination.  The fact that she was terminated twenty days after returning from leave is not sufficient by itself.  "The

---

[11]Plaintiff was involved in a motor vehicle accident on the way home from work that day.  The doctor's note for her time off concerned her physical injuries, and not her psychological condition.

[12]Although an employee is not required to use the specific terminology of "FMLA leave" to be entitled to it, plaintiff was an HR executive responsible for counseling Target employees on matters such as FMLA leave.

Third Circuit has stated that 'the mere fact that adverse employment action occurs after [a protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" Reinhart v. Mineral Tech. Inc., 2006 WL 4050695, at *11 (E.D. Pa. 2006) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).

Perhaps recognizing this deficiency, plaintiff argues, "Coupled with a discrimination claim on the basis of disability under the NJLAD, Plaintiff presents ample evidence to show that her employer not only knew of her psychological disorders but also caused her to suffer the adverse employment actions of transfer and termination on the basis of her utilizing FMLA leave." (Pl. Opp. at 33.)  This conclusory statement, which attempts to piggyback her NJLAD disability discrimination claim with her FMLA retaliation claim[13], is not sufficient to support her burden of providing evidence to prove a *prima facie* case of FMLA retaliation.  As a result, her FMLA claim fails as well.

## 4.  **Plaintiff's hostile work environment claim**

Plaintiff also claims that Target fostered a hostile work environment violative of the NJLAD because she did not receive

---

[13]Indeed, these two claims are not reconcilable.  On the one hand, plaintiff complains that Target discriminated against her because of her disability, but on the other hand, plaintiff admits that Target provided her with the paid leave she requested to manage her psychological condition.

any support in her duties at the Gloucester store, and through the lack of response by Target to the altercation with JuJuan Robinson.  These allegations cannot support a *prima facie* case of hostile work environment.

To establish a hostile work environment claim under the NJLAD, a plaintiff "'must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001) (quoting <u>Taylor v. Metzger</u>, 706 A.2d 685, 688-89 (N.J. 1998)).  As with her "reverse" race discrimination claims, plaintiff must also prove that Target is the unusual employer who discriminates against the majority." <u>Erickson</u>, 569 A.2d at 551.

Plaintiff has provided no evidence to support her claim that she suffered hostility at the hands of Target employees because she is white.  Although plaintiff claims that she did not receive support from her superiors to assist her in her job duties, and she believes her concerns about the incident with Ms. Robinson were not taken seriously, her belief that her work environment was "hostile" in the general sense of the word cannot support an NJLAD claim that the conditions at Target of were severe and pervasively abusive because of her race.  Anti-discrimination

26

laws do "not set forth a general civility code for the American
workplace." Burlington Northern and Santa Fe Ry. Co. v. White,
548 U.S. 53, 68 (2006) (citation omitted).[14]  Accordingly, Target
is entitled to judgment in its favor on plaintiff's hostile
environment claim.

   **B.   *Target's motion for judgment on its breach of contract
        claim against plaintiff***

   Target has also moved for summary judgment in its favor on
its counterclaim against plaintiff for breach of contract.[15]

_____

   [14]Burlington Northern concerned a Title VII claim, but the
elements of a Title VII claims and NJLAD claim are essentially
the same, and therefore a court applies the same standard to
either claim.  Cardenas v. Massey, 269 F.3d 251, 263 n.2 (3d Cir.
2001).

   [15]Target's motion for summary judgment is an alternative to
its motion for default judgment on its counterclaim.  Target
contends that it is entitled to default judgment because since
its counterclaim was filed in September 2008, plaintiff has never
filed an answer in response to Target's claim against her.  Even
after Target moved for default judgment in July 2009, to date
plaintiff has still failed to file an answer.  Despite
plaintiff's failure to file an answer, there are two reasons for
why the Court will not grant default judgment, but will instead
resolve Target's motion on its alternative basis pursuant to
Federal Civil Procedure Rule 56: (1) default judgment is a two-
step process, requiring Target to first ask the Clerk of the
Court to enter default as to plaintiff, which it does not appear
Target has done, see Fed. R. Civ. P. 55(a), and (2) in
determining whether Target is entitled to default judgment, the
Court must still analyze the merits of Target's claims and
determine if it is entitled to judgment, Franklin v. National
Maritime Union of America, (MEBA/NMU), Civ. No. 91-480, 1991 WL
131182, *1 (D.N.J. July 16, 1991) (quoting 10 Wright, Miller &
Kane, *Federal Practice and Procedure* § 2685 (1983)) (stating that
a court is "required to exercise 'sound judicial discretion' in
deciding whether the judgment should be entered [and] '[t]his
element of discretion makes it clear that the party making the
request is not entitled to a default judgment as of right, even
when defendant is technically in default and that fact has been

Target claims that plaintiff signed a confidentiality agreement upon her employment with Target, and she breached that agreement by improperly retaining, and then disseminating in this litigation, confidential and litigation-privileged documents provided to her by Target's attorneys to prepare for her deposition in the EEOC litigation.  Target also asks that the Court enjoin plaintiff from disclosing or otherwise continuing to use the information.

When Target hired plaintiff in May 2003, plaintiff signed a written Confidentiality Agreement with Target, that provided, in relevant part,

> I understand and agree that I will not, without Target Corporation's written consent, disclose, use or publish (or cause/authorize others to do the same) any "confidential information" of Target Corporation, either during my employment or after my employment ends, except as my Target Corporation job duties require.  "Confidential Information" is specific, sensitive, private information about Target Corporation business and legal affairs . . . .  I understand that this Agreement does not include a complete list of Confidential Information. . . .
>
> . . .
>
> If my employment with Target Corporation ends, I will return to Target Corporation all materials that belong to Target Corporation and/or contain Confidential Information, and all other materials, products, technology or processes in my possession or under my control which relate to Target Corporation . . . . I understand that all Confidential Information and all items described in this paragraph belong exclusively to Target Corporation.

---

noted under Rule 55(a)'").

. . .

> Target Corporation shall be entitled, in addition to
> any other remedies available, to injunctive and/or
> equitable relief to prevent a breach of this Agreement
> or any part of it, and reasonable attorney's fees in
> enforcing this Agreement.[16]

(Def. Statement of Facts, ¶ 15.)

During the EEOC litigation concerning the Springfield store,
plaintiff, as the store's top-level HR representative, was a key
witness.  During the course of the litigation, Target's counsel
provided plaintiff with a packet of confidential and attorney-
client privileged information.  These materials were provided to
plaintiff in order to prepare her for her deposition.  According
to Target, its attorneys specifically instructed plaintiff to
destroy these documents following her deposition.

Plaintiff did not destroy the documents, however, and
instead provided them to her counsel in this case, who then
produced many of them in response to Target's first document
production request.  Recognizing that plaintiff retained this
information, which plaintiff also revealed in several attempts to
amend her complaint, Target's counsel sent a letter to

---

[16]On the first page of the Confidentiality Agreement, it
advises that the "Agreement is a legal contract," and in bold,
capitalized letters, "IF YOU DO NOT UNDERSTAND THE AGREEMENT,
SEEK ADVICE BEFORE SIGNING IT."  It also explicitly notifies
plaintiff that if she violates the agreement, Target "may take
legal action against me."  Prior to plaintiff's signature line,
the agreement restates in bold lettering, "IMPORTANT: This is a
legal contract.  If you do not understand it, seek advice before
signing it."  (Def. Ex. D, docket no. 48-7.)

plaintiff's counsel demanding the return of the confidential

information.  Plaintiff's counsel refused.  The parties then

entered into a consent protective order, which provided,

> Information that Defendant deems to be confidential and
> privileged information that was retained by Plaintiff
> following her termination and which was produced to
> Defendant in discovery . . . shall be designated as
> "Confidential" under the terms of this Order,
> regardless of whether the face of the documents in
> question were stamped "Confidential."  Neither party
> waives their rights with respect to any defense or
> claim under Defendant's Counterclaim with respect to
> such documents.

(Docket No. 44 at 2.)

In its motion, Target argues that plaintiff breached her

contract--the Confidentiality Agreement she signed upon being

hired--by retaining the documents and by using them in her

litigation against Target.  In plaintiff's defense to Target's

claim, plaintiff first argues that although she admits that at

some point in time Target's EEOC counsel directed her to destroy

certain documents in her possession, she received other documents

subsequent to that conversation that she was not instructed to

discard or return, or that she was not told were confidential or

privileged.  She also contends that she was told to destroy

documents after the conclusion of the EEOC litigation, but she

was never informed of when it concluded.  Additionally, plaintiff

argues that the package of materials that she received from

Target's counsel came in a manilla envelope with the notation

"Witness Kit of Panda Allia for Deposition Preparation 1/31/06

30

(Ms. Allia's Copy)," indicating that these documents belonged to her.  Plaintiff also argues that the consent protective order she entered into during the course of this litigation supersedes any other agreement with Target concerning its documents, and it permits both plaintiff and Target to use the documents during the course of this litigation.  Plaintiff argues that the events concerning the EEOC litigation are a basis for her claims, and this allows her to use the documents here.  Plaintiff also points out that Target discussed several documents from the manilla envelope when it took plaintiff's deposition.  The fact that Target has used the very materials it seeks to punish plaintiff for using forestalls Target from advancing any claim against her--that is, plaintiff argues that Target "cannot have it both ways."

The Court's review[17] of the documents produced by plaintiff

---

[17]Target has supported its publicly-filed motions with redacted versions of the confidential/privileged documents, and has provided unredacted versions to the Court for in camera inspection.  In support of her oppositions, plaintiff has not done the same, but rather has failed to file on the public docket her exhibits, contending they are too voluminous to electronically file.  Target has filed several letters objecting to the contents of plaintiff's exhibits--which contain all the confidential information at issue in Target's claim for breach of contract--and requests that the exhibits either are not electronically filed or they be redacted prior to filing. Because of the stage of the case, the fact that the documents at issue have been publicly filed in redacted form by Target, and because the Court finds plaintiff's exhibits to be extremely voluminous, the Court will not order plaintiff's exhibits to be filed.  Relatedly, the Court will not specifically describe the contents of the confidential and/or privileged documents so as to prevent further dissemination of such materials.  These documents

to Target that Target considers a breach of the confidentiality agreement, and provided to the Court in support of her opposition to Target's motions, shows that not only did plaintiff retain numerous documents that are clearly marked "Confidential" or "Attorney/Client Privileged and Word Product Document," but that she did not even reveal the full extent of the documents in her possession until now, as several documents, clearly marked confidential or privileged and attached as exhibits to her opposition to Target's motion, were not provided to Target during discovery.  The Court's review of these documents also shows that plaintiff's numerous reasons for obtaining and using such documents are without merit at this stage in the proceedings.

A contract, such as a confidentiality agreement, consists of an offer, acceptance and consideration.  <u>Corestar Intern. Pte. Ltd. v. LPB Communications, Inc.,</u> 513 F. Supp. 2d 107, 116 (D.N.J. 2007); <u>S O Designs USA, Inc. v. Rollerblade, Inc.,</u> 620 N.W.2d 48, 53 (Minn. App. 2000) ("The basic elements of contract law, offer, acceptance and an exchange of consideration.").[18]

---

are sufficiently described in Target's papers.

[18]The Confidentiality Agreement contains a choice of law provision, which indicates that Minnesota law should govern it. (Def. Ex. D. ¶ 11.)  Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination.  <u>Robeson Industries Corp. v. Hartford Acc. & Indem. Co.,</u> 178 F.3d 160, 165 (3d Cir. 1999).  New Jersey law states that a contractual choice of law provision will be upheld unless doing so would violate its public policy.  <u>Lucey v. FedEx Ground Package Systems, Inc.,</u> 2009 WL 51644, *3 (3d Cir. 2009); <u>Instructional Systems, Inc. v. Computer Curriculum Corp.,</u> 614

To prove a breach of a confidentiality agreement, a plaintiff must show that a valid agreement existed, defendant materially breached the terms of the agreement, and plaintiff suffered damages as a result of the breach.  Sery v. Federal Business Centers, Inc., 616 F. Supp.2d 496, 507 (D.N.J. 2008) (discussing New Jersey law); Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (discussing Minnesota law).

In this case, plaintiff does not dispute that she entered into a valid contract, i.e., the Confidentiality Agreement, with Target.  Despite her protestations, however, plaintiff also cannot dispute that she breached the plain language of that contract.  The Confidentiality Agreement provides: (1) she would not "disclose, use or publish (or cause/authorize others to do the same) any 'confidential information' of Target Corporation, either during my employment or after my employment ends"; (2)

---

A.2d 124, 133 (N.J. 1992) (following the Restatement (Second) of Conflicts of Laws § 187 (1969), which provides that "the law of the state chosen by the parties will apply, unless either: (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties").  In this case, even though the elements of a breach of contract claim are the same in both New Jersey and Minnesota, and, therefore, it appears as though the choice-of-law provision should be upheld, the Court will not engage in a choice of law analysis.  Instead, the Court finds that under either law, plaintiff has breached the Confidentiality Agreement.

that Target's "legal affairs" are considered "confidential

information"; and (3) that after termination, she would "return

to Target Corporation all materials that belong to Target

Corporation and/or contain Confidential Information, and all

other materials, products, technology or processes in my

possession or under my control which relate to Target

Corporation."  It is undisputable that following her termination,

plaintiff retained, used, and disclosed Target's confidential

information, in clear contravention of the Confidentiality

Agreement she entered into with Target.

Even affording plaintiff every favorable inference, and even

accepting as true and reasonable plaintiff's explanations for

retaining all the documents in connection with the EEOC

litigation--mainly, that she was confused as to the nature and

extent of her obligations regarding the handling of litigation

documents[19]--she cannot explain why, after Target has repeatedly

_____

        [19]Even though the Court has accepted as true for the
purposes of deciding Target's motion all of plaintiff's
explanations, they appear to be legally insufficient: (1)
plaintiff provides no legal basis to explain how the consent
protective order she entered into during the course of this
litigation supersedes any other agreement with Target concerning
its documents, and even if it did, the consent protective order
reserved Target's right to prosecute its breach of contract claim
regarding these documents against plaintiff; (2) the litigation
privilege, noted below, negates plaintiff's argument that because
the events concerning the EEOC litigation are a basis for her
claims, she is permitted to use the documents here; (3) if Target
used confidential and privileged information to support its
position in defense of plaintiff's claims--rather than for the
purpose of establishing plaintiff's liability for her breach of
contract--Target, as holder of the privilege and rights to the

informed her of her breach during the course of this litigation,
through numerous letters, motions, court conferences, a
counterclaim, and a protective order which reserves its right to
prosecute its counterclaim, she believes that she can continue to
hold onto, use, and publicly publish documents that are
incontrovertibly confidential and/or privileged.  Her view that
she is "protecting herself" in this litigation with these
documents is irreconcilable with the fact that she instituted
this action against Target.  Both plaintiff's contract with
Target, and the law[20], prohibit her use of such materials as a
litigation sword.  Moreover, if plaintiff believed the contents
of these documents were necessary evidence to support her case,
she could have used the normal discovery process--through
document requests, requests for admissions, depositions--in order
to achieve the same result.

Accordingly, the Court finds that there is no issue of
material fact as to plaintiff's liability for breaching the

_____

confidential materials, is permitted to waive that privilege or
right if it so desires.  It appears, however, that with regard to
Target's questioning of plaintiff in her deposition with regard
to the confidential materials, Target used the materials provided
by plaintiff's counsel to inquire how she obtained the documents
and why she retained them.  (See, e.g., Docket No. 48-5, Def. Ex.
B at 12, Pl. Dep. at 66-69.)

[20]See, e.g., Component Hardware Group, Inc. v. Trine Rolled
Moulding Corp., 2007 WL 2177667, *5 (D.N.J. 2007) (citing Baglini
v. Lauletta, 768 A.2d 825, 833 (N.J. Super. Ct. App. Div. 2001))
(providing that the litigation privilege grants an absolute
privilege to statements or communications made by attorneys in
the course of judicial and quasi-judicial proceedings).

Confidentiality Agreement with Target.[21]  With regard to damages,
the Confidentiality Agreement provides that "Target Corporation
shall be entitled, in addition to any other remedies available,
to injunctive and/or equitable relief to prevent a breach of this
Agreement or any part of it, and reasonable attorney's fees in
enforcing this Agreement."  The common law for breach of contract
also allows for injunctive relief, as well as attorney's fees
where there is a contractual provision providing for such fees.[22]
See A. Hollander & Son v. Imperial Fur Blending Corp., 66 A.2d
319, 325 (N.J. 1949) (providing that a court may issue an
injunction due to an employee's breach of the confidentiality
agreement); State, Dept. of Environmental Protection v. Ventron
Corp., 468 A.2d 150, 166 (N.J. 1983) ("[L]egal expenses, whether

_____

[21]The Court notes that Target alerted plaintiff in writing
on August 12, 2008 regarding her violations of the
Confidentiality Agreement and the Agreement's provision for
attorney's fees prior to the filing of its counterclaim.  (See
Def. Ex. O, P.)  In that letter, Target specifically advised
plaintiff's counsel of the documents which were confidential or
privileged, and demanded immediate return of those documents.
The letter also informed plaintiff's counsel that if Target did
not receive those documents by August 20, 2008, it would have no
choice but to pursue relief in the Court.  The Court also notes
that plaintiff has been repeatedly advised of Target's position
since the filing of its counterclaim on September 23, 2008, and
during numerous subsequent court conferences and litigation
proceedings and filings.  As discussed above, to date, plaintiff
never filed her answer to Target's counterclaim.

[22]Target has not asked for, and has not shown, any monetary
damages resulting from plaintiff's breach.  This is not fatal to
its claim, as Target need only prove a breach of the contract,
and not actual damages.  Video Pipeline, 275 F. Supp. 2d at 568
(explaining that a plaintiff who proves a breach of contract but
no actual damages may not recover more than nominal damages).

for the compensation of attorneys or otherwise, are not recoverable absent express authorization by statute, court rule, or contract."); N. Bergen Rex Transport, Inc., v. Trailer Leasing Co., 730 A.2d 843, 848 (N.J. 1999) ("Under New Jersey law, parties may contract to shift the fees and costs in the event of litigation between them."); Cherne Indus., Inc. v. Grounds & Associates, Inc., 278 N.W.2d 81, 92 (Minn. 1979) (providing that a court may issue an injunction due to an employee's breach of a confidentiality agreement); id. at 96 ("Generally attorneys fees may not be awarded to a successful litigant absent specific contractual or statutory authority.").

The Court finds that Target is entitled to its request for injunctive relief.  Plaintiff has violated the Confidentiality Agreement's prohibition of retaining and disseminating confidential information, and she has violated the principles and protections of the litigation privilege by retaining and sharing Target's privileged litigation documents and work product.  She continues to do so, as evidenced by her response to Target's motion.  Consequently, in order to prevent plaintiff's continued violations, she must be enjoined from using and retaining all copies of Target's confidential and privileged information in her possession that she obtained during her employment with Target, and she will be directed to immediately return to Target that same material.

With regard to attorney's fees, Target is entitled to them
pursuant to the terms of the Confidentiality Agreement, which
provides that the fees must be reasonable, and related to
Target's "enforcing" of the Agreement.  The determination of the
reasonableness or relevancy is within the Court's discretion,
however.  To that end, the Court directs Target to submit an
affidavit establishing its attorney's fees in accordance with
Local Civil Rule 54.2.  <u>See, e.g.</u>, <u>Ramada Worldwide, Inc. v. Rip</u>
<u>Management Group Corp.</u>, 2009 WL 1810733, *11 (D.N.J. 2009)
(finding that in "the absence of countervailing considerations,
and defendants have suggested none, . . . [plaintiff] is entitled
to recover reasonable attorney's fees and costs incurred in
connection with this breach of contract action, as expressly
agreed to by defendants in the License Agreement and Guaranty,"
and directing plaintiff to comply with Local Civil Rule 54.2).

<u>**CONCLUSION**</u>

Although plaintiff claims that Target discriminated and
retaliated against her during her employment simply because she
is Caucasian, is psychologically disabled, lodged complaints
against co-workers, and took protected leave, plaintiff has
failed to present sufficient evidence to support these claims or
refute that Target terminated her because of her poor
performance.  Additionally, plaintiff has not provided a
sufficient basis to find that she did not breach her

38

confidentiality agreement with Target by retaining and using
Target's confidential and privileged materials during the course
of this litigation.  Accordingly, Target's motions for summary
judgment--one in its favor on plaintiff's claims against it, and
the other in its favor on its claim against plaintiff--must be
granted.  An appropriate Order will issue.


Date: <u>March 17, 2010</u>                    <u>  s/ Noel L. Hillman      </u>
                                        NOEL L. HILLMAN, U.S.D.J.


At Camden, New Jersey